**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **WILLIAM BURNEY**, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-01087-TNM |
| **PHILLIP SUGGS, _et al._**, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

William Burney has sued the District of Columbia and two of its police officers[1]

(collectively, Defendants) for alleged misconduct during an interaction at his apartment.  Burney

brings claims under 42 U.S.C. § 1983 against Officers Roberto Adams and Lance Bishop,

alleging that they falsely arrested and used excessive force against him in violation of his Fourth

Amendment rights.  _See_ Compl. at 3, ECF No. 1-2.  Burney also brings common law claims of

false arrest, assault, and battery against Adams and Bishop, and seeks to hold the District

vicariously liable for their torts.  _See_ Compl. at 4–5.

The officers now move for summary judgment on the § 1983 claims based on qualified

immunity and on the common law claims based on the existence of probable cause and qualified

privilege.  _See_ Defs.' Mot. for Summ. J. (Defs.' MSJ) at 5, 19–20, ECF No. 34.  The District also

moves for summary judgment, contending that it is not vicariously liable because its employee-

---

[1] Burney first sued Officers Phillip Suggs, David Wallace, Tracey Williams, Lance Bishop, Kamau Green, and Roberto Adams.  _See_ Compl., ECF No. 1-2.  After conducting discovery, Burney concedes that Officers Suggs, Wallace, Williams, and Greene should be dismissed from the case because they neither arrested nor assaulted him.  _See_ Opp'n at 1 n.1; Defs.' Reply to Pl.'s Opp'n at 3.  Therefore, the Court will enter judgment for Officers Suggs, Wallace, Williams, and Greene.

officers are not liable for the underlying torts of false arrest, assault, and battery.  *See id.* at 20–21.  In support of their motion, Defendants submitted body-worn camera (BWC) footage from Officer Adams and deposition transcripts from various officers on the scene.  *See* SUMF ¶ 4 n.1; Defs.' MSJ, Exs. 2–8.

Based on the evidence, no reasonable jury could find that the officers violated Burney's Fourth Amendment rights by falsely arresting him or by using excessive force against him.  So the Court finds that the officers are entitled to qualified immunity and will grant the officers summary judgment on these claims.  And because the Court may exercise supplemental jurisdiction over Burney's common law claims, it will grant the officers summary judgment on these claims too because the officers had probable cause to arrest Burney and their use of force was privileged.  The Court will also grant the District summary judgment on Burney's vicarious liability claim because its employee-officers are not liable for the underlying common law torts.

## I.

According to Burney's Complaint, officers came to his apartment on an early March morning and falsely arrested him.  Compl. ¶ 7.  Burney claims that when the officers came to his apartment, he tried to open his front door but did not have the key to the deadbolt.  Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Opp'n) at 3, ECF No. 36.  He also claims that when he went to the rear of the apartment, an officer "tried to bull rush his way" into Burney's residence.  *See id.*  Burney next alleges that the officers grabbed and searched him without his consent.  Compl. ¶ 7.  More, he claims that the officers subjected him to excessive force, injuring his arm, leg, hands, and shoulder.  *Id.* ¶ 10; Opp'n at 4.  Burney also alleges that he experienced pain and suffering from his encounter with the officers.  Compl. ¶ 10.  He states that he was "shocked" by the encounter because he had "not been resisting or refusing to cooperate with the police."  Opp'n at

3.  Burney then reports that the officers kept him in handcuffs for more than 45 minutes, after which he went to the hospital.  *See id.* at 4.

There are two problems with Burney's version of the story.  First, though Burney describes various facts in his Opposition, he does not directly dispute Defendants' Statement of Undisputed Material Facts (SUMF) in his Statement of Material Facts (SMF).  *Compare* SUMF, ECF No. 34, *with* SMF, ECF No. 36.  For example, Defendants assert that Burney was only in cuffs for 20 to 40 minutes.  SUMF ¶ 20.  Burney counters that he was in cuffs for longer than 45 minutes, *see* Opp'n at 4, but he does not reference this fact in his SMF.  *See* SMF ¶¶ 1–4. Indeed, Burney disputes only four facts in his SMF: (1) that the officers had reasonable suspicion that he committed a crime; (2) that he posed a danger to his family or to the officers on the scene; (3) that he resisted the officers or tried to flee; and (4) that the force used by Officers Adams and Bishop was excessive.  *See* SMF ¶¶ 1–4.  Thus, the Court considers all other facts in Defendants' SUMF as admitted.  *See* LCvR 7(h)(1); *see also SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000).

The second problem for Burney is Officer Adams' body-worn camera footage.  *See* Defs.' MSJ, Ex. 6 (BWC).  It flatly contradicts Burney's presentation of the facts.  According to Defendants' SUMF and the footage, the story is as follows.

In the early hours of March 31, 2020, a grandmother made a frightening call to 911. SUMF ¶ 1, 3.  She reported that someone under the influence of the drug Phencyclidine (PCP) was holding her and some children hostage inside a residence.  *Id.* ¶¶ 2, 3.  She explained that she was "locked inside the room" with the children and was afraid.  *Id.*  The grandmother also noted that the individual was "speaking in tongues."  *Id.*

Several MPD officers drove to Burney's apartment after receiving the call. SUMF ¶ 1. When the officers arrived, one knocked loudly on the front door of the apartment and shouted "police, open the door." *Id*. ¶ 5; BWC 2:47–3:35. The officer continued to knock and shout, but no one answered. *Id.* A neighbor across the hall came outside to speak to the officers. *Id.* ¶ 6; BWC 3:07–3:37. She reported hearing noise from a disturbance earlier that morning, which was loud enough to shake her cabinets. *Id.* The neighbor said that the noise was unusual. *Id.* The officers then asked this neighbor if they could walk through her apartment to access the rear of the apartment building. BWC 3:34–4:08. She consented, and the officers moved through her apartment, exiting through the back door. *Id.*; SUMF ¶ 7.

An officer then knocked loudly on the back door of Burney's apartment. BWC 4:25–5:13. He shouted, "Police, open the door!" *Id.* Again, no one answered. *Id.* Another officer then moved around to the side of the apartment building and began knocking on a window. *Id.* at 5:36–5:57. This officer called out, "hey, just trying to see if you're okay" as she knocked. *Id.* at 7:30–7:36. The officer who had been knocking on the back door then moved to a different window with a protruding air conditioning unit. *Id.* at 8:20–8:47. He yelled again: "Police, come open the door!" *Id.*

Suddenly, several voices from within the window responded, "We can't." *Id.* at 8:49–8:52. The officer asked why, to which the voices exclaimed, "We can't get out!" *Id.* at 8:52–9:30. They also stated that they could not open the back door because "He's in there somewhere." *Id.* The officer asked where the man was. *Id.* at 9:42–9:59. A woman responded, "in the hall." *Id.* Then, someone inside the apartment began yanking the window air conditioning unit inward. *Id.* And the officer prepared to climb through the hole left by the air conditioning unit. *Id.* at 10:05–10:26.

Just as he was about to climb through the window, the officer turned and noticed Burney coming around the back of the residence.  SUMF ¶ 10; BWC 10:16–10:28.  Burney stopped and stared at the officer.  BWC 10:16–10:28.  Then he retreated.  *Id.*; SUMF ¶ 11.  As Burney moved toward the back door, the officer followed him, saying, "What's up boss? . . . Where'd you come from?"  BWC 10:25–10:39.  Burney responded that he lives in the apartment and that he was just inside.  *Id.*  He said that "nothing is going on" and that the officers "can't just come and go" as they were.  *Id.*  Throughout the exchange, Burney backed away from the officer into the apartment, and thus toward the apparent hostages.  *Id.*  At that time, the officer called for backup. *Id.* at 10:39–10:43.  Burney then said, "excuse me, you don't" and tried to pull the door closed on the officer.  *Id.*

But the officer held the door open.  *Id.*  He then told Burney to "calm down" and to "relax" multiple times.  *Id.* at 10:43–10:57.  He asked Burney to step outside so they could talk. *Id.*  Burney began speaking very quickly.  *Id.*  Burney said, "You can't just walk in" while continuing to back away from the officer into the apartment.  *Id.*  As the officer followed him, Burney began resisting.  *Id.*  The officer repeatedly asked him to step outside, after which Burney said, "You can't do that."  *Id.*  The officer responded, "Yes we can," and continued to ask Burney to step outside.  *Id.* at 10:57–11:02.  Burney responded that he had to be at work and continued to resist.  *Id.*  By now, several other officers had joined them.  *Id.*  Burney continued to tell the officers to "hold on, hold on, hold on" and they kept telling him to "calm down."  *Id.* Then, an officer told Burney to put his hands behind his back.  *Id.*  At that point, two other officers moved in to assist and they asked Burney to step outside.  *Id.* at 11:03–11:06.  Again, Burney told them to "hold on."  *Id.*

5

Next, an officer executed a takedown maneuver on Burney.  *Id.* at 11:03–11:10; SUMF ¶ 15.  He did so because Burney did not comply with the order to step outside, and he did not want Burney to retreat into the apartment from which women and children had been trying to escape through a window.  SUMF ¶ 15; BWC 10:39–11:06.  The bodycam footage shows that Burney was on the ground for less than a minute.  BWC 11:05–11:55; SUMF ¶ 17.  During that time, Burney continued to shout at the officers, telling them to "hold on!"  BWC 11:05–11:55.  After handcuffing Burney, the officers repeatedly asked him to sit down at a table outside the apartment.  *Id.* at 12:05–13:58.  Burney again did not comply.  *Id.*  So the officers sat him up.  SUMF ¶ 18.  A paramedic then offered Burney medical attention.  BWC 13:50–14:05.

Some officers moved into the apartment to question the inhabitants—including the grandmother who called 911, some children, and Burney's girlfriend—one of whom had tried to pull the window air conditioning unit inside.  SUMF ¶ 4; BWC 20:16–21:05.  Burney's girlfriend told officers that Burney was "triggered that morning" by her alarm going off and began "banging on the door" and "speaking in tongues" after the girlfriend shut herself and her son in the room with the air conditioning unit.  *Id.*  Other officers questioned Burney for 20 to 40 minutes outside.  SUMF ¶ 20.

## II.

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" about a material fact if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986).  Usually when ruling on a motion for summary judgment, the Court assumes the truth of the non-movant's statements, except for

conclusory allegations lacking any factual basis in the record.  *See Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).

Not so when the record includes video evidence.  When a video "quite clearly contradicts" one party's side of the story, the Court may credit the video's depiction of events. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In *Scott*, also a § 1983 case against officers, the Supreme Court reasoned that the plaintiff's "version of events [was] so utterly discredited by the [video] record that no reasonable jury could have believed him."  *Id.*  Rather than rely on "such visible fiction," courts "should view the facts in the light depicted by the videotape."  *Id.* at 381 (cleaned up).

Police officers have qualified immunity from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021).  A right is clearly established if existing precedent places it "beyond debate."  *Id.* at 8.  Whether an officer has used excessive force depends on the facts of the case, "including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  And "[i]n excessive force cases, a police officer's motion for summary judgment should be denied "only when . . . a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions."  *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).  Because qualified immunity provides "immunity from suit rather than a mere defense to liability" and is "effectively lost if a case is erroneously permitted to go to trial," the viability of this defense

should be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).

## III.

### A.

Burney alleges that the officers violated his Fourth Amendment rights by falsely arresting him. Compl. ¶¶ 28–30. The officers move for summary judgment, arguing that they are entitled to qualified immunity. *See* Defs.' MSJ 8–11, 13–17. The Court agrees.

Claims of false arrest implicate the Fourth Amendment right to be free from unreasonable seizures. *See* U.S. Const. amend. IV. Encounters between police officers and citizens may take the form of an investigative detention, *see Terry v. Ohio*, 392 U.S. 1, 27 (1968), or a formal arrest, *see Dunaway v. New York*, 442 U.S. 200, 208–09 (1979). Investigative detentions, or *Terry* stops, are permissible if an officer has "a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry*, 392 U.S. at 30).

Arrests require more. They must be supported by probable cause. *See Dunaway*, 442 U.S. at 208–09. Probable cause exists "if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed." *United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993).

Here, the parties dispute whether the officers merely detained, or actually arrested, Burney. *Compare* Compl. ¶ 28, *with* Defs.' MSJ 8–9. A situation that begins as a *Terry* stop may mature into a formal arrest. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985). But "[t]he point at which an investigative stop becomes an arrest is not marked with a bright line." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). Courts must consider the

length of the seizure, the law enforcement purposes it serves, and the time reasonably necessary to achieve those purposes. *See Sharpe*, 470 U.S. at 685.

In *Hall*, for example, the D.C. Circuit concluded that a detention became a formal arrest when the police handcuffed and held a woman accused of not paying her restaurant bill in a police cruiser for 45 minutes. *See Hall*, 867 F.3d at 153. The Circuit reasoned that the officers did not "undertake even the most basic means of investigation" that could quickly confirm or refute their suspicions about Hall. *Id.* The officers did not ask Hall whether she paid for dinner, and they did not check with the restaurant, either. *Id.* The court therefore found that a 45-minute detention in a police cruiser under those circumstances crossed the line from an investigatory stop to an arrest. *Id.* at 154.

Now consider *Sharpe*. In *Sharpe*, the Supreme Court held that police officers' detention of a suspected drug trafficker for 20 minutes did not mature into an arrest where the officer "pursued his investigation in a diligent and reasonable manner." *Sharpe*, 470 U.S. at 687. The Court noted that the officers "expeditiously" investigated at the scene while detaining the suspect. *Id.* More, the Court explained that the suspect presented no evidence of the police's dilatory conduct. *Id.* Indeed, it concluded that the length of the detention stemmed in part from the suspect's "evasive actions." *Id.* at 687–88.

Here, the police arrived at Burney's apartment to investigate whether someone was holding women and children hostage. SUMF ¶ 2; Defs.' MSJ at 11. After handcuffing Burney, the police held him outside his apartment for between 20 and 40 minutes. SUMF ¶ 20. A medic offered Burney medical attention. BWC 13:50–14:05. And the officers asked him questions about the potential hostage situation within his apartment. SUMF ¶ 22; Defs.' MSJ at 10–11. At the same time, other officers moved inside the apartment to care for and question any potential

hostages.  SUMF ¶ 4.  Unlike in *Hall*, these officers did not dawdle in seeking to confirm or refute their suspicions about Burney holding individuals against their will in the apartment.  *See* SUMF ¶ 4, 20; BWC 20:16–21:05.  Just as in *Sharpe*, the officers "pursued [their] investigation in a diligent and reasonable manner."  *Sharpe*, 470 U.S. at 687.

But the Court need not decide the precise question of whether the officers' interaction with Burney began as a *Terry* stop and matured into an arrest.  Because the Court finds the officers had probable cause to arrest Burney, and that the officers violated no clearly established constitutional right in doing so, they are entitled to qualified immunity on the false arrest claim.

Qualified immunity applies unless Burney can show that the officers (1) violated a constitutional right, and (2) that the right was "clearly established" at the time of the violation. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014).  A right is "clearly established" if a reasonable officer would have understood that his conduct violates that right.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  False arrest claims under § 1983 implicate the Fourth Amendment.  The officers are entitled to qualified immunity on Burney's false arrest claim if there was "an objectively reasonable basis for believing that the facts and circumstances surrounding the arrest were sufficient to establish probable cause."  *Hedgpeth v. Rahim*, 893 F.3d 802, 807 (D.C. Cir. 2018).

Recall that probable cause exists "if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed." *Holder*, 990 F.2d at 58.  Probable cause is "not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The existence of probable cause "depends on the totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003),

and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Gates*, 462 U.S. at 243 n.13.

Before determining whether the officers had an objectively reasonable basis to believe they had probable cause to arrest Burney, the Court must determine which set of facts to credit. Burney's side of the story casts him as a man tending to his family in the morning before going to work. *See* Opp'n at 2–3. Burney claims that he tried to open the front door when the police knocked but did not have the key. *Id.* at 3. Burney also argues he was "shocked" by his arrest because he "had not done anything wrong." *Id.* In short, he argues that the officers did not have reasonable suspicion that he committed a crime. SMF ¶ 1.

But Defendants' SUMF and the video footage tell the story differently. Because trustworthy video footage exists that "blatantly contradicts" Burney's story, the Court will rely on the video and Defendants' SUMF when Burney does not dispute Defendants' SUMF in his SMF. *Scott*, 550 U.S. at 380; *see also Elshazli v. District of Columbia*, 415 F. Supp. 3d 20, 25 (2019).[2]

After careful review of the evidence, including the video footage, the Court finds that the officers "had an objectively reasonable basis for believing that the facts and circumstances surrounding the arrest were sufficient to establish probable cause." *Hedgpeth*, 893 F.3d at 807. As described, the police received a radio call from a grandmother who reported that someone under the influence of drugs was holding her and children hostage. SUMF ¶ 2, 3. The caller stated that the man was speaking in tongues, that she was locked inside a room, and that she was afraid. *Id.* Upon arriving at the scene, the officers repeatedly tried to gain entry to the apartment

_____

[2]  Burney does not contest the accuracy of the bodycam footage.  Indeed, he relies on parts of it for his argument. *See, e.g.*, Opp'n at 4–5.

through both the front and rear doors.  BWC 2:47–3:35; 4:25–5:13.  When that strategy failed, the officers communicated with people inside the apartment through a window.  *Id.* at 8:52–9:59. These people told the officers that they could not get out, they referenced a man inside the apartment, and then they took the drastic step of beginning to dismantle the air conditioning unit, presumably to create an access or escape route.  *Id.*  Burney then walked around the side of the residence, saw the officers, promptly turned around, and moved back into the apartment.  *Id.* at 10:16–10:39.  The officer pursued Burney, asking him several times to stop and speak with him. *Id.* at 10:39–10:57.  Burney did not comply.  *Id.*  Instead, he continued to resist and attempted to move back into the apartment.  *Id.* at 10:57–11:02.

Based on these facts, the officers had an objectively reasonable basis to think they were witnessing an active hostage situation, and that Burney was trying to escape toward the hostages. This could have created a very dangerous situation for all involved.  Burney's bare assertion that the officers were unaware of "*any* facts that would indicate that a crime had been committed," Opp'n at 8, simply contradicts the record.  That the officers did not ultimately charge Burney with any crime does not affect whether the officers had an objectively reasonable basis to support probable cause in the first place.  *See Florida v. Harris*, 568 U.S. 237, 249 (2013) (explaining that courts do not evaluate probable cause in hindsight).  The totality of the circumstances—including the 911 call, inability to gain access to the residence, statements and actions from the people inside, and Burney's evasive behavior—suggest that Burney had been, or was about to commit, the crime of kidnapping.  *See* Defs.' MSJ at 11 (citing D.C. Code § 22-2001, which criminalizes kidnapping, abducting, or concealing an individual).  The officers are therefore entitled to qualified immunity on Burney's § 1983 false arrest claim, and the Court will grant summary judgment in their favor.

**B.**

Burney also alleges that the officers violated his Fourth Amendment rights by using excessive force during his arrest.  Compl. ¶¶ 32–34.  The officers move for summary judgment, arguing that they are entitled to qualified immunity.  *See* Defs.' MSJ 12–17.  Again, the Court agrees.

The officers are entitled to qualified immunity unless Burney can show that they (1) violated a constitutional right, and (2) that the right was "clearly established" at the time of the violation.  *Plumhoff*, 572 U.S. at 778.  A constitutional right is "clearly established" if every reasonable officer would have understood that his conduct violates that right.  *See al-Kidd*, 563 U.S. at 741.

Like false arrest claims, excessive force claims also implicate the Fourth Amendment right to be free from unreasonable seizures.  *See Graham*, 490 US. at 395.  The Court applies an "objective reasonableness standard" to assess whether officers violated this right.  *Id.* at 396.  And "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  In assessing reasonableness, the Court considers factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

Again, the Court must decide which set of facts to rely on for purposes of summary judgment.  Burney claims that an officer "tried to bull rush his way" into the apartment before throwing Burney to the ground.  Opp'n at 3.  And Burney asserts that he did not resist arrest or try to flee the scene.  SMF ¶ 3; *see* Opp'n at 9.  On his telling, he was simply tending to his family and preparing to go to work.  *See* Opp'n 2–3.

13

But the video speaks for itself.  After repeated attempts to gain entry to Burney's residence, officers resorted to speaking through the windows to the people who said they were trapped.  BWC 8:20–9:59.  Just as the officer was about to climb through the window to reach the presumed hostages, he noticed Burney outside at the back of his residence.  SUMF ¶ 10; BWC 10:16–10:28.  The officer followed Burney to ask him questions.  BWC 10:25–10:29.  Burney retreated back into his apartment, tried to pull the door closed on the officer, and said, "excuse me, you don't."  BWC 10:39–10:43.  After the officer held the door open, he repeatedly told an agitated Burney to "calm down" and to "relax" multiple times.  *Id.* at 10:43–10:57.  And the officer asked Burney many times to step outside to talk to the police.  *Id.*  But Burney said, "you can't do that" and continued to back away toward the area where the officers had reason to believe he was holding hostages.  *Id.*; *see also id.* at 10:57–11:02.

Even after several other officers had appeared, Burney continued to resist, rapidly telling the officers to "hold on, hold on, hold on."  *Id.*  He also refused police commands to put his hands behind his back.  *Id.*  Contrary to Burney's allegations, *see* Opp'n at 3, the video does not show any officer trying to "bull rush" into the apartment, BWC 10:16–11:06.  On the contrary, the officers on the scene repeatedly asked Burney to calm down, relax, and step outside.  *See id.*  When Burney continued to refuse police commands while backing into the apartment toward the suspected hostages, an officer executed a takedown maneuver on him.  *Id.* at 11:03–11:10; SUMF ¶ 15.  During and after the takedown, Burney continued to shout at the officers and defy their commands to sit down.  *Id.* at 11:05–13:58.  After the officers placed him in a seated position, a paramedic offered him medical attention.  BWC 13:50–14:05.

Because trustworthy video footage exists that "blatantly contradicts" Burney's representations, the Court will again rely on the video and Defendants' SUMF in deciding

whether summary judgment is proper.  *See Scott*, 550 U.S. at 380.  Based on the video, the Court

finds that the officers acted reasonably when using physical force to secure Burney.  *See*

*Graham*, 490 U.S. at 396.  The first *Graham* factor—the severity of the crime—favors the

officers.  *See id.*  Recall from Part III.A that the officers had reason to believe that Burney was

committing the crime of kidnapping—a felony under District law.  The police also had reason to

believe that Burney posed an immediate threat to the safety of others, and that he was actively

resisting arrest.  *See id.*  The video shows Burney repeatedly refusing to comply with police

commands to speak with officers, step outside, and put his hands behind his back.  BWC 10:25–

11:55.  Instead, Burney continued to back away from officers into his apartment, where the

officers had every reason to believe he was holding hostages.  *Id.*  The officers had received a

911 call stating as much, they could not get anyone to open the front or back doors, they heard

people shouting through a window "We can't get out!," and they observed someone removing a

window air conditioning unit to create a point of entry or exit.  *See* SUMF ¶¶ 1–3, 5; BWC 8:49–

10:26.  "[J]udged from the perspective of a reasonable officer on the scene," the officers had

little choice but to act as they did when Burney repeatedly disobeyed their commands.  *Graham*,

490 U.S. at 396; *accord Elshazli*, 415 F. Supp. 3d at 25–26.

The D.C. Circuit has found that officers acted lawfully when using similar, or even

greater, degrees of force in analogous circumstances.  In *Hedgpeth*, for example, the Circuit held

that police did not use excessive force in conducting a takedown maneuver on a non-compliant

suspect.  *See Hedgpeth*, 893 F.3d at 809–10.  The court noted that the suspect "exhibited

belligerent and erratic behavior," "shouted at officers in an increasingly agitated fashion," and

"repeatedly refused the officers' orders" to put his hands behind his back.  *Id.* at 810.  Under

such circumstances, the Circuit concluded that the officers' takedown maneuver was objectively

reasonable and that they were entitled to qualified immunity.  *Id.* at 811; *see also Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (finding an officer did not use excessive force when he forcefully pulled a woman's arm behind her back, shoved her against a stone column, and ripped apart the earbud on her headphone after she ignored officer commands to stop dancing at the Jefferson Memorial); *Cromartie v. District of Columbia*, 470 F. App'x 355, 357 (D.C. Cir. 2012) (per curiam) (explaining that police who "slammed to the ground, handcuffed, and forcibly kept on the ground" a suspect used "no more than the ordinary 'degree of physical coercion'" to effect an arrest, "especially given that Cromartie's belligerence and disobedience suggested he might try to resist or escape" (quoting *Wasserman v. Rodacker*, 447 F.3d 635, 641 (D.C. Cir. 2009)).

The officers' conduct here was reasonable when viewed from the perspective of an officer on the scene.  Contrary to Burney's account, the video does not show that officers "bull rush[ed]" Burney to throw him to the ground for no reason.  *See* Opp'n at 3–4.  Rather, the footage displays that the officers repeatedly asked Burney to step outside, answer their questions, and put his hands behind his back.  BWC 10:16–11:06.  The takedown occurred only after multiple efforts to obtain Burney's compliance failed.  *Id.*  During the takedown, the officers held Burney on the ground for less than a minute.  *Id.* at 11:05–11:55.

Burney disputes that the officers used a reasonable amount of force.  SMF ¶ 4.  He argues that he did not commit a crime and that the notion he had kidnapped anyone was "ridiculous" because evidence at the scene showed that his family had voluntarily locked themselves inside a room.  Opp'n at 9.  However, the Court assesses reasonableness from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Even though the police did not charge Burney with a crime and his family may have

16

locked themselves in the room, the officers arriving on the scene reasonably believed they were facing a hostage-barricade situation.  The combination of the 911 call, the officers' inability to gain entry to the residence, the people inside shouting through the window that they could not get out, and Burney's non-compliance with commands informed the officers' actions.  SUMF ¶¶ 1–3, 5; BWC 8:49–10:26.

Burney invokes a bevy of cases from other jurisdictions, which he claims establish that an officer's use of force is excessive if it is enough to dislocate a suspect's shoulder.  *See* Opp'n 9–10.  But these cases neither prove what Burney claims, nor put the officers on notice that their conduct would have violated clearly established law.  In *Mickle v. Morin,* for example, the Second Circuit reversed a district court's judgment as a matter of law for the officers because it found that a jury could have credited plaintiff's version of events to find that her dislocated shoulder resulted from excessive force.  *See* 297 F.3d 114, 122 (2d Cir. 2002).  Similarly, the Tenth Circuit held in *Miller v. Layton City* that genuine issues of fact existed as to whether the officers applied excessive force when the plaintiff suffered a dislocated shoulder and a broken clavicle.  *See* No. 99-4215, 2000 WL 1580843, *1–2  (10th Cir. Oct. 24, 2000).

In short, Burney's authorities establish only that a shoulder injury can be probative, but not dispositive, of excessive force.  He has thus not carried his burden to show that the officers violated a clearly established right, meaning a legal principle that is "settled law . . . dictated by controlling authority or a robust consensus of cases of persuasive authority."  *Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 27–28 (D.D.C. 2021) ("It is 'not enough that the rule is suggested by then-existing precedent.'" (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018))).  Not only are his cases not on-point, they are neither controlling nor so pervasive as to show a "robust consensus" on this issue.

Based on the video footage, the officers used a reasonable amount of force to secure a suspect who would not comply with their commands, and who was trying to move back into his residence where the police suspected he was holding hostages. Nothing suggests that the officers applied force that was so apparently excessive "that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw*, 1 F.3d at 1303. The officers are therefore entitled to qualified immunity as to Burney's § 1983 excessive force claim, and the Court will grant summary judgment in their favor.

### C.

Because the Court resolves all federal claims in favor of Defendants and Burney does not plead the requirements of diversity jurisdiction, *see* 28 U.S.C. § 1332, the Court must consider whether to exercise supplemental jurisdiction over Burney's common law claims, *see* 28 U.S.C. § 1367. The Court will do so and will grant the officers summary judgment on Burney's false arrest, assault, and battery claims. The Court also finds that the District is not vicariously liable for Burney's common law claims because the officers are not liable for the underlying offenses.

Before exercising supplemental jurisdiction, the Court must first decide whether Burney's federal and state law claims "derive from a common nucleus of operative fact" so that the entire action before the Court is one constitutional case. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997). If so, the Court must next decide whether to exercise its discretion to hear the claims. *See id.* at 173. A court may decline to exercise supplemental jurisdiction if the state law claims raise novel or complex issues, if the state law claims predominate over the federal claims, or if there are other compelling reasons. *See id.; see also* 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, this Court may

18

also consider "principles of economy, convenience, [and] fairness." *Int'l Coll. of Surgeons*, 522 U.S. at 172–73.

Burney's § 1983 claims of false arrest and excessive force arise from the same incident as his common law claims of false arrest, assault, and battery.  Burney argues that the officers violated both § 1983 and the common law when they executed a takedown and arrested him at his residence when investigating the 911 call.  Compl. ¶¶ 13–34; *see also* Opp'n at 6–13.  Thus, the federal and common law claims form one constitutional case.  *See Int'l Coll. of Surgeons*, 522 U.S. at 165.  More, even though the Court has dismissed all of the federal claims, the remaining state claims do not raise novel or complex issues of state law.  On the contrary, the standards for the state law claims resemble the standards for the federal law claims.  So principles of judicial economy and fairness favor this Court exercising supplemental jurisdiction over Burney's common law false arrest, assault, and battery claims. [3]

**1.**

Burney argues that the officers committed false arrest under the common law, and that the District is vicariously liable for the actions of its officer-employees.  Compl. ¶ 14–15; Opp'n at 12–13.  The officers argue that they are entitled to summary judgment on all claims because they had probable cause to arrest Burney, and their use of force is privileged because it was reasonable under the circumstances.  Defs.' MSJ at 19–20.  Again, the Court agrees with the officers.

---

[3]  When exercising supplemental jurisdiction, federal courts apply the forum state's choice of law rules.  *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995).  The District applies the "substantial interest" test for choice of law, which considers where the injurious conduct occurred, the residence of the parties, and the place of the parties' relationship.  *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004).  Here, the alleged injury occurred in the District, and the parties' relationship begins and ends there.  So the Court will apply District law in ruling on Burney's common law claims.

The elements of common law false arrest "are substantially identical" to those of a constitutional claim for false arrest. *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996). For both claims, the key question is "whether the arresting officer was justified in ordering the arrest of the plaintiff." *Id.* at 754. And the "existence of probable cause is equally fatal to both claims." *Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 168 (D.D.C. 2020). In the common law context, "probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed." *In re T.H.*, 898 A.2d 908, 912 (D.C. 2006) (cleaned up). Though probable cause is more than a "hunch" or a "gut" feeling, "the threshold is not set unreasonably high." *Id.* at 912–13.

As the uncontested facts in Defendants' SUMF and the video show, the officers at Burney's residence knew of "facts and circumstances . . . sufficient in themselves to warrant a reasonable belief" that Burney had either committed the crime of kidnapping, *see* D.C. Code § 22-2001, or was doing so at that time. *In re T.H.*, 898 A.2d at 912. The 911 call about a man on drugs holding people hostage, the officers' inability to gain entry to the residence, the people inside shouting through the window that they could not get out, and their action to pull the air conditioner inward to create an entry or exit route all support a finding of probable cause. *See* SUMF ¶¶ 1–3, 5; BWC 8:49–10:26. The officers had reason to believe they were facing an active hostage situation. More, Burney did not comply with their commands. BWC 10:57–11:55. Because the Court finds the officers had probable cause to arrest Burney, they are entitled to summary judgment on his common law false arrest claim. And because the officers are not liable for that tort, the District is not vicariously liable. *See, e.g.*, *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2015).

**2.**

Burney next argues that the officers committed assault and battery under the common law, and that the District is vicariously liable for the actions of its officer-employees.  Compl. ¶¶ 18–19; 22, 25.  The officers argue that their use of force was privileged under the circumstances because they used only the amount of force reasonably necessary under the circumstances. Defs.' MSJ at 20–21.  The officers are correct.

District law defines assault as "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff." *Smith v. District of Columbia*, 882 A.2d 778, 787 (D.C. 2005).  And District law defines battery as "an intentional act that causes a harmful or offensive bodily contact." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007).

But "District law provides a government actor with a privilege defense to such tort claims when '(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable.'" *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (cleaned up)).  Police officers therefore possess a "qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which he reasonably believes are necessary." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993).  And the "calculus of reasonableness" recognizes that "police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396–97).  The District's qualified privilege analysis largely mirrors § 1983 qualified immunity analysis. *See Bushrod*, 521 F. Supp. 3d at 29–30.

Burney has not shown that the officers made an "unlawful attempt or threat . . . to do physical harm" to him. *Smith*, 882 A.2d at 787.  Though Burney alleges that the officers caused

him apprehension of harmful and offensive conduct, *see* Compl. ¶ 18, he does not show that such conduct was unlawful, *see* Opp'n at 12 (asserting only that there was no legal justification for his arrest).  And in any event the Court finds the officers' use of force under the circumstances privileged because they used no force in excess of what was reasonably necessary to subdue Burney.  *Etheredge*, 635 A.2d at 916.  Recall that the officers had little choice but to execute a takedown on Burney after he repeatedly refused to comply with police commands, and continued to move back into his residence where the officers believed he was holding hostages.  *See supra* Part III.A–B; *see also* Bishop Dep. 6:21–7:3, ECF No. 34-5 (discussing that police conducted a takedown only after they commanded Burney multiple times to come outside and put his hands up, but he did not comply).

Burney's only response is that the officers' use of force was "objectively unreasonable," Opp'n 12–13, which the Court has already determined is false.  Because the Court finds that the officers' use of force was privileged under the circumstances, they are entitled to summary judgment on Burney's common law assault and battery claims.  And because the officers are not liable for the underlying tort, the District is not vicariously liable.  *See, e.g.*, *Hargraves*, 134 F. Supp. 3d at 93.

## IV.

For these reasons, the Court will grant Defendants' Motion for Summary Judgment as to all claims.  A separate Order will issue.


Dated: September 20, 2022

TREVOR N. McFADDEN, U.S.D.J.